## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| NIKOLETTE HOBBS, individually and on behalf of her deceased child, NOAH PATRICK HOBBS | * | CIVIL ACTION NO. 25-224 |
| | * | JUDGE ELDON E. FALLON |
| VERSUS | * | MAGISTRATE JUDGE |
| | * | KAREN WELLS ROBY |
| PEDIATRIC KID-MED, LLC, DERGAL FAY BURBANK, M.D., MPH, RAJESH K. SHARAMA, M.D., F.A.A.P., MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, AND RECKITT BENCKISER GROUP, LLC | * | |
| | * | |
| | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*

## <u>ORDER & REASONS</u>

Before the Court are five total motions, one filed by Plaintiff Nikolette Hobbs, individually and on behalf of her deceased child, Noah Patrick Hobbs, and four filed by the various defendants. Plaintiff moves to stay and/or remand this case. R. Doc. 13. Defendants Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Reckitt Benckiser LLC (collectively, the "Mead Defendants") oppose the motion. R. Doc. 19. Plaintiff did not reply.

Pediatric Kid-Med LLC, Deregal F. Burbank, M.D.,[1] Harish C. Anand, M.D., and Rajesh K. Sharma, M.D. (collectively, the "Medical Defendants") move to dismiss Plaintiff's Petition under Rule 12(b)(6) for failure to state a claim and for prematurity. R. Doc. 12. Plaintiff does not oppose the motion.

Mead Johnson Nutrition Company ("Mead Nutrition") and Reckitt Benckiser LLC ("Reckitt") each individually move to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.

---

[1] "Dr. Deregal F. Burbank was incorrectly identified as Dergal F. Burbank, M.D. in plaintiff's petition for damages and this court's case caption." R. Doc. 12-1 at 1 n.1.

R. Docs. 7, 8. Plaintiff opposes both motions. R. Doc. 15. Mead Nutrition and Reckitt jointly replied. R. Doc. 18.

Finally, Mead Defendants altogether move to dismiss all of the claims stated in Plaintiff's petition pursuant to Rules 12(b)(6) and 8(a)(2) for failure to state a claim. R. Doc. 6. Plaintiff opposes the motion. R. Doc. 14. Mead Defendants replied. R. Doc. 17.

Considering the record, briefing, and applicable law, the Court now rules as follows.

## I.    BACKGROUND

This case arises from the death of Plaintiff's infant son. Plaintiff filed a Petition for Damages in state court against the Medical Defendants and Mead Defendants, alleging that her son died after consuming infant formula recommended to her by the Medical Defendants and manufactured by the Mead Defendants. R. Doc. 3-1. Plaintiff's son was born prematurely and spent around seventeen days in the neonatal intensive care unit ("NICU") presumably due to his low weight. *Id.* at 3. There, NICU nurses began adding an infant formula to the breast milk he was consuming to increase his weight. *Id.* Once his weight increased enough to be discharged, the NICU care providers referred Plaintiff to Defendant Pediatric Kid-Med, LLC for further treatment. *Id.*

Medical providers at this facility scheduled Plaintiff's son for weekly visits to monitor his weight gain. *Id.* They recommended Plaintiff continue fortifying her breast milk, so they prescribed an infant formula to her during or around their initial visit. Her son's stomach did not tolerate this first formula, so at a later visit, the treating physician recommended a different infant formula. *Id.* at 4. Again, her son's stomach could not tolerate it, and the doctors recommended a third formula. *Id.* Plaintiff's son seemed to tolerate the third formula. *Id.* But at a later October 23, 2023 appointment, a medical provider diagnosed her son with thrush and changed the formula

recommendation for a fourth time to Enfamil's Nutramigen Hypoallergenic with Probiotics (the "Subject Formula"). *Id.* The provider also prescribed her son thrush medication, which Plaintiff believes burned his tongue and impeded his ability to latch onto his bottle. *Id.*

Two days later, at an October 25, 2023 appointment, the treating physician allegedly expressed no concerns to Plaintiff about her son and the change from the third formula to the Subject Formula. *Id.* The next day, however, Plaintiff avers that her son "presented unusually" when she fed him his usual bottle of milk fortified with the Subject Formula. *Id.* Not long after, he vomited and gasped for air. *Id.* at 5. Plaintiff attempted to suction the vomit from his mouth and administered chest compressions. *Id.* Eventually, emergency responders took her son to a hospital where doctors determined that he experienced cardiac arrest, was unresponsive to physical stimuli, and had indications of sepsis, dry mucous membranes, bradycardia, and intermittent spontaneous respiration. *Id.* Doctors placed her son on a ventilator and intubated him. *Id.* Ultimately, Plaintiff made the difficult decision to cease medical care, and her son died the following day. *Id.*

Plaintiff initially filed a Petition in state court and asserted two distinct claims. Her first set of claims are brought under the Louisiana Medical Malpractice Act ("LMMA") and concerns the Medical Defendants who treated her son and prescribed him the Subject Formula. Plaintiff's second set of claims are brought against the Mead Defendants, who are alleged to be the manufacturers of the Subject Formula, pursuant to the Louisiana Products Liability Act ("LPLA") and Louisiana redhibition laws. *Id.* at 7-9. Plaintiff seeks damages for pain and suffering, mental anguish, emotional distress, and medical expenses. *Id.* at 9-10. Mead Defendants removed this case on the basis of diversity jurisdiction, arguing that the parties are diverse because the in-state Medical Defendants are improperly joined. R. Doc. 3. Because the subject matter jurisdiction here

is based on diversity of citizenship, Louisiana substantive law governs. *Learmonth v. Sears, Roebuck & Co.*, 710 F.3d 249, 258 (5th Cir. 2013).

## II.    PRESENT MOTIONS

There are five pending motions before the Court, which will be addressed in three parts. The first part addresses two motions: Plaintiff's motion to stay or, alternatively, remand, and the Medical Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). R. Docs. 12, 13. The core inquiry of both motions is whether Plaintiff's claims against the Medical Defendants may proceed even if she has not properly exhausted her administrative remedies. Plaintiff's position is that the Court should stay this case until the state medical review panel's decision "has been delivered to plaintiff." R. Doc. 13-1 at 2-3. Alternatively, she requests a remand because diversity jurisdiction is destroyed due to the Medical Defendants being properly joined. *Id.* at 3-6. Medical Defendants move to dismiss this action as premature, preventing Plaintiff from stating a claim and making their joinder improper. R. Doc. 12. To bolster their position that Plaintiff's claims are premature, they request the Court take judicial notice of the Louisiana Certificates of Enrollment attached to the notice of removal, showing that each of the Medical Defendants are qualified healthcare providers under the LMMA.  R. Docs. 3-2, 3-3, 3-4, & 3-5.

Part two of this Order addresses the two motions to dismiss based on a lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). R. Docs. 7, 8. Defendants Mead Nutrition and Reckitt each argue that this Court lacks both general and specific jurisdiction over them, and that Defendant Mead Johnson & Company is the true, sole manufacturer of the Subject Formula. R. Docs. 7, 8. Both Mead Nutrition and Reckitt attach declarations from corporate representatives which attest to the same. R. Docs. 7-1, 8-1. Plaintiff jointly opposes both motions, arguing in part that Mead Nutrition and Reckitt hold themselves out to be the manufacturers of the Subject

Formula. R. Doc. 15. Defendants jointly replied, reiterating their arguments that the three named

defendant-companies are separate and distinct and that the Subject Formula's label "unequivocally

establishes" that Mead Johnson & Company is the manufacturer. R. Doc. 18.

The final part addresses the Mead Defendants' motion to dismiss pursuant to Fed. R. Civ.

P. 12(b)(6). R. Doc. 6. There, Mead Defendants argue that Plaintiff failed to adequately plead the

four LPLA liability theories, her redhibition claim, and the doctrine of *res ipsa loquitor*. R. Doc.

6-1 at 5-17. They also assert that the LPLA provides the exclusive remedy for Plaintiff's recovery,

so any claims of negligence and redhibition based on non-economic losses should be dismissed.

*Id.* at 3-4. Plaintiff opposes the motion. R. Doc. 14. She generally asserts that she has pled sufficient

facts to survive at the motion to dismiss stage. *Id.* Mead Defendants replied and largely reiterated

their original arguments. R. Doc. 17.

### III.    LAW & ANALYSIS

The Court begins by assessing whether Plaintiff's claims against the Medical Defendants

are timely. Then, the Court will address Mead Nutrition and Reckitt's 12(b)(2) motions to dismiss

for lack of personal jurisdiction. The Court concludes with consideration of the Mead Defendants'

12(b)(6) motion.

#### A.  The Medical Defendants Have Been Improperly Joined.

Federal courts may exercise original jurisdiction over a civil action between citizens of

different states if the amount in controversy exceeds $75,000.00.[2] 28 U.S.C. § 1332(a)(1). When an

action is filed in state court and is removed solely on the basis of diversity jurisdiction, the parties in

interest that are "properly joined" may not be citizens of the State in which the action is brought. *Id.* at

§ 1441(b)(1). "A defendant is improperly joined if the moving party establishes that (1) the plaintiff

---

[2]    Plaintiff does not contest that the amount in controversy exceeds $75,000.00.

*has* stated a claim against a diverse defendant that [s]he alleges is nondiverse, or (2) the plaintiff *has not* stated a claim against a defendant that [s]he properly alleges is nondiverse." *Int'l Energy Ventures Mgmt., LLC v. United Energy Grp., Ltd.*, 818 F.3d 193, 199 (5th Cir. 2016). Here, the latter applies, as the Medical Defendants argue that Plaintiff has not stated a claim against them because she did not exhaust her administrative remedies, and the Medical Defendants are non-diverse. *See* R. Doc. 12.

"The Court has an obligation to determine whether a plaintiff has improperly joined a party that defeats federal diversity jurisdiction." *Flagg v. Stryker Corp.*, 819 F.3d 132, 136 (5th Cir. 2016) (en banc). And "if the plaintiff improperly joins a non-diverse defendant, [] the court may disregard the citizenship of that defendant, dismiss the non-diverse defendant from the case, and exercise subject matter jurisdiction over the remaining diverse defendant[s]." *Id.* To determine whether to dismiss the non-diverse defendants from this case, this Court will assess "whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant." *Id.* (quoting *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 574 (5th Cir. 2004) (en banc), *cert. denied*, 544 U.S. 992 (2005)). "Crucially, '[j]urisdictional facts are determined at the time of removal, not by subsequent events.'" *Id.* (quoting *Louisiana v. Am. Nat'l Prop. & Cas. Co.*, 746 F.3d 633, 635 (5th Cir. 2014)).

Here, the Medical Defendants argue that they must be dismissed from this suit as improperly joined because Plaintiff's claims against them are premature for failure to exhaust her administrative remedies. R. Doc. 12-1. The Fifth Circuit assessed a case whose facts and procedural history are nearly identical to this case, *Flagg v. Stryker Corp.*, 918 F.3d 132 (5th Cir. 2016) (en banc), and affirmed the district judge's dismissal of non-diverse parties because they were improperly joined. There, the plaintiff—like the Plaintiff here—brought LMMA claims against medical providers and LPLA claims against manufacturers. *Id.* at 134-135. The manufacturing defendants, who were completely diverse from the plaintiff, removed the case to federal court on the basis of diversity jurisdiction. *Id.* at 135.

Like both groups of defendants here, the *Flagg* defendants argued that the in-state medical defendants were improperly joined because the plaintiff there "failed to administratively exhaust his medical malpractice claims before filing this lawsuit as required by Louisiana law." *Id.*

Louisiana courts have commanded that "no action for malpractice against a qualified health care provider, or his insurer, may be commenced in any court prior to submission of the complaint to a medical review panel *and the panel has rendered its expert opinion on the merits of the complaint*."[3] *Delcambre v. Blood Sys., Inc.*, 2004-0561 (La. 1/19/05), 893 So. 2d 23, 27 (emphasis added). The *Flagg* plaintiff, like Plaintiff here, presented his medical malpractice claims to the state review panel but filed his suit in state court before the panel rendered its opinion.[4] *Flagg*, 819 F.3d at 138. The Fifth Circuit, finding that his claims would have been dismissed if presented in state court, held that the plaintiff there "was unable to 'establish a cause of action against the [Medical Defendants] in state court.'" *Id.* (quoting *Smallwood*, 385 F.3d at 573).

This Court similarly finds that Plaintiff is unable to establish a cause of action against these Medical Defendants in state court. If this case were remanded, state law would require the trial court to grant the dilatory exception of prematurity the Medical Defendants filed before this case was removed. *See Self v. Willis-Knighton Med. Ctr.*, 55,130 (La. App. 2 Cir. 8/9/23), 369 So. 3d 455, 460 ("A tort suit that is subject to the LMMA that is filed before the completion of the medical review panel process is subject to dismissal on an exception of prematurity. . . . The exception of prematurity, as

---

[3]    The Court notes that the Medical Defendants must be qualified providers under the LMMA for this jurisdictional bar to apply. *See Douglas v. Pathway Mgmt. of La., LLC*, 56,040 (La. App. 2 Cir. 4/9/25), 408 So. 3d 1186, 1193 (addressing La. Rev. Stat. Ann. § 40:1231.2(A) and explaining that "[t]o be qualified as a health care provider under the LMMA, the provider must (1) cause to be filed with the board proof of financial responsibility; and (2) pay the surcharge assessed on all healthcare providers in accordance with the LMMA"). Plaintiff does not dispute that the Medical Defendants are qualified healthcare providers under the LMMA.
        The Court will take judicial notice of the certified copies of enrollment for each of the Medical Defendants that were attached to the Mead Defendants' Notice of Removal, R. Doc. 3, pursuant to its authority to do so under Federal Rule of Evidence 201. Thus, the jurisdictional exception will apply to the Medical Defendants.
[4]    The Court further notes that Plaintiff does not dispute that her claims are brought under the LMMA and sound in medical malpractice.

provided in La. C.C.P. art. 926, raises the issue of whether the judicial right of action has yet to come into existence because a prerequisite condition has not been fulfilled."). The Medical Defendants have therefore been improperly joined, their citizenship will not be considered for jurisdictional purposes, and the claims brought against them must be dismissed. Accordingly, the Court will not address any of the remaining arguments in the Medical Defendants' 12(b)(6) motion.

Separately, Plaintiff's motion to stay or remand in and of itself serves as evidence that the Mead Defendants are improperly joined. In *Flagg*, the Fifth Circuit approved of the district court's use of the plaintiff's motion to stay to aid in its finding that the medical defendants were improperly joined, noting that "by filing his motion to stay, [Plaintiff] admitted in a public court record that he failed to exhaust his [administrative] claims." *Flagg*, 819 F.3d at 136-137, 137 n.16. Here, Plaintiff's motion to stay states that she "*initiated* a medical malpractice action . . . against the" Medical Defendants. R. Doc. 13-1 at 1 (emphasis added). Additionally, none of Plaintiff's pleadings represent that the state medical review panel rendered its opinion before the Mead Defendants removed this suit to federal court. R. Doc. 13 at 1 (emphasis added). As a result, the Court assumes that the review panel has not yet issued its final determination. Crucially, because jurisdictional facts are decided at the time of removal, and Plaintiff did not make a showing that the panel issued its final decision before removal, the only reasonable conclusion is that the Medical Defendants are improperly joined. *Flagg*, 819 F.3d at 136. Consequently, the Court finds there is diversity jurisdiction between all properly joined parties. Her request for stay or remand must therefore be denied.

### B.  This Court Has Personal Jurisdiction Over the Mead Defendants.

The Court will now turn to the Mead Defendants to address whether this Court has personal jurisdiction over two of the three named companies. Federal Rule of Civil Procedure 12(b)(2) confers a right upon defendants to seek dismissal of any claims against them where personal jurisdiction is

lacking. Indeed, personal jurisdiction is "an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (internal quotation marks omitted). "When a nonresident defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Jobe v. ATR Mktg., Inc.,* 87 F.3d 751, 753 (5th Cir. 1996). At the preliminary motion to dismiss stage, a plaintiff need only make a prima facie showing of jurisdiction. *ITL Intern., Inc. v. Constenla, S.A.*, 669 F.3d 493, 496 (5th Cir. 2012). All undisputed facts submitted by the plaintiff in support of jurisdiction, as well as facts contested in affidavits, will be resolved in favor of jurisdiction. *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006).

The Due Process Clause of the Fourteenth Amendment governs the Court's exercise of jurisdiction. "A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution." *Latshaw v. Johnson*, 167 F.3d 208, 211 (5th Cir. 1999). Here, Louisiana's long-arm statute, La. R.S. § 13:3201(B), extends jurisdiction to the constitutional limit, providing that a court "may exercise personal jurisdiction over a nonresident on any basis consistent with . . . the Constitution of the United States." As such, the "two inquiries fold into one," and a separate analysis of the Louisiana long-arm statute and due process is unnecessary. *Luv N' care*, 438 F.3d at 469. The sole question before the court, then, is whether the defendant has meaningful "contacts, ties, or relations" with Louisiana, such that the exercise of jurisdiction over the defendant would not offend constitutional due process. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945).

These contacts, ties, and relations may manifest in the Court having general personal jurisdiction, specific personal jurisdiction, or both. *See Helicopteros Nacionales de Colombia, S.A. v.*

*Hall*, 466 U.S. 408, 414-15 (1984). Where a defendant has "continuous and systematic general business contacts" with the forum state, the court may exercise "general" jurisdiction over any action brought against that defendant. *Id.* Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum." *Id.* Here, Plaintiff does not directly assert in her Petition nor her opposition to the Rule 12(b)(2) motions that this Court has general jurisdiction over Mead Nutrition and Reckitt. *See* R. Docs. 3-1, 15. Instead, the Petition explicitly pleads that neither Mead Nutrition nor Reckitt are domiciled in or have their principal places of business in Louisiana. R. Doc. 3-1 at 1-2. The Petition does, however, assert that the defendants "have purposefully availed themselves of the jurisdiction of Louisiana." *Id.* at 3. Therefore, the Court will conduct only a specific jurisdiction analysis.[5]

### a. Plaintiff Has Made a Prima Facie Showing of Specific Personal Jurisdiction.

To satisfy the constitutional requirements for specific jurisdiction, due process requires a showing of "(1) minimum contacts by the defendant purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant be fair and reasonable." *ITL Intern.*, 669 F.3d at 498. Once a plaintiff establishes the first two requirements, the burden shifts to the defendant to demonstrate that the exercise of personal jurisdiction would be unfair or unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). To be clear, "[p]roof by a preponderance of the evidence is not required" at this stage in the proceedings. *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990). The Court may consider affidavits, depositions, and other documentation outside of the plaintiff's complaint when determining

---

[5]    The Court briefly notes that it agrees with Mead Nutrition and Reckitt's arguments that the circumstances present here are not the kinds of "exceptional" instances that would warrant a finding of general jurisdiction as contemplated by the Supreme Court in *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 447-48 (1952) (finding that a federal court had jurisdiction over a company whose president temporarily relocated the company from the Philippine Islands to Ohio during World War II because of ongoing threats).

whether personal jurisdiction exists. *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332 (5th Cir. 1982). The Court will assess all three elements in turn.

### 1. Minimum Contacts with Louisiana

The Court will first analyze Mead Nutrition and Reckitt's minimum contacts, or lack thereof, with Louisiana. Minimum contacts with a forum state are required under due process because when a defendant has sufficient contacts with a forum state, it "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). "[T]his 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of and relate to' those activities." *Burger King*, 471 U.S. at 472-73 (internal citations omitted).

Here, to show minimum contacts with Louisiana, Plaintiff avers that Mead Nutrition and Reckitt "placed the [Subject Formula] in the nationwide stream of commerce with the expectation that it would be purchased, distributed, and used in Louisiana." R. Doc. 15 at 9. The "stream-of-commerce" test applies in situations where, like here, "a nonresident defendant, acting *outside* the forum, places in the stream of commerce a product that ultimately causes harm *inside* the forum." *Goodyear Dunlop Tire Ops., S.A. v. Brown*, 564 U.S. 915, 926 (2011). Under the stream-of-commerce test, "mere foreseeability or awareness" will be a "constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce, but [t]he defendant's contacts must be more than random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Ainsworth v. Moffet Eng'g, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013) (internal quotations and citations omitted). Courts in this circuit have found that a defendant's "actual knowledge or expectation of delivery to the forum state is a sufficient basis for personal jurisdiction."

*Boat Servs. of Galveston, Inc. v. NRE Power Sys., Inc.*, 429 F. Supp. 3d 261, 271 (E.D. La. 2019) (collecting cases).

Upon a review of the record and evidence submitted by the parties, the Court finds that Plaintiff has made a prima facie showing of minimum contracts through the stream-of-commerce theory by (1) submitting exhibits suggesting that Mead Nutrition and Reckitt may somehow be involved with the Subject Formula, and (2) plausibly demonstrating that the Subject Formula was placed in Louisiana's stream of commerce in a way that was not merely random or the unilateral activity of a third party. *See Ainsworth*, 716 F.3d at 177. To make her prima facie case, Plaintiff attaches to her joint opposition three exhibits—purported websites which facially and publicly connect Mead Nutrition and Reckitt with the Subject Formula.[6] R. Docs. 15-1, 15-2, 15-3. Mead Nutrition and Reckitt, on the other hand, submit declarations averring that the companies are not involved in, *inter alia*, the manufacturing and marketing of the Subject Formula. R. Docs. 7-2, 8-2. When viewed both in a light most favorable to Plaintiff and in favor of jurisdiction, the contents of the website postings cloud the contents of the attestations of the company representatives such that this Court cannot decline to exercise personal jurisdiction over Mead Nutrition and Reckitt at this time.

The Court will first turn to Plaintiff's evidence. Two of the three exhibits submitted by Plaintiff, Exhibits B and C, appear to be identically titled website postings announcing that "Reckitt/Mead Johnson Nutrition Voluntarily Recalls Select Batches of Nutramigen Hypoallergenic Infant Formula Powder Because of Possible Health Risk." R. Docs. 15-2, 15-3. Plaintiff represents that she captured Exhibit B from the U.S. FDA's website. R. Doc. 15 at 3. Exhibit C seems to be captured from "www.reckitt.com/us/newsroom" and lists "Copyright Reckitt Benckiser Group plc" on the final page. R. Doc. 15-3. Notably, Defendants aver that Reckitt Benckiser Group is the parent company of the

---

[6]     As a threshold matter, the Court notes that it observes the contents of Plaintiff's website exhibits only for their existence, not for their truth. Fed. R. Evid. 201.

alleged manufacturer, Mead Johnson & Company. R. Doc. 8 at 4. Both website postings state that "Reckitt/Mead Johnson Nutrition (MJN)" announced the recall of the infant formula, and that "All product[s] tested by MJN w[ere] confirmed negative for contaminants." R. Doc. 15-2 at 2; R. Doc. 15-3 at 1. Altogether, observing the contents of these exhibits for their existence and not their truth, these webpages give rise to the inference that Reckitt and/or Mead Johnson Nutrition are somehow involved with the Subject Formula and its presence in the stream of commerce.

Further, Plaintiff's Exhibit A is a different website post, apparently taken from a webpage whose copyright is also owned by "Reckitt Benckiser Group plc," the purported manufacturer's parent company. R. Doc. 15-1. The top of the exhibit states "Home > Our Brands" and the webpage's title appears to be "For Cow's Milk Allergy and Colic Due to Cow's Milk Allergy." R. Doc. 15-1 at 1. It then depicts a logo that reads "Reckitt" and another logo that reads "Nutramigen." *Id.* At the end of the webpage, a navigation bar states "Reckitt.com" and includes a column titled "Our Brands," under which "Nutramigen" is listed. *Id.* at 4. This apparent overlap between the Mead Defendants—viewed on publicly accessible websites—suggests that all three Mead Defendants exist within a complicated corporate structure that may be factually complex. *See Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (finding discovery designed to support an alter ego theory of personal jurisdiction is warranted if there are issues of fact that need to be explored).

The Court's observation of the potential factual complexity of the Mead Defendants' corporate structure is further supported by statements and evidence submitted by Mead Nutrition and Reckitt. First, Mead Nutrition and Reckitt represent in their joint reply that "Reckitt Benckiser LLC is a sister company that does not manufacture or sell the formula at issue, and Mead Johnson Nutrition Company is merely a holding company that likewise does not manufacture or sell the product at issue." R. Doc. 18 at 1. Further, they attach to their reply brief a copy of the Subject Formula's label, which they state

"unequivocally establishes that Mead Johnson & Company, LLC is the entity that manufactures" the Subject Formula. R. Doc. 18 at 5. The Court, however, does not view the label this simply. The Court concedes that the label does state "©2022 Mead Johnson & Company, LLC" in two places. However, the larger, more legible portion of the label is a trademarked logo bearing the words "Mead Johnson Nutrition," which are the same words used in the name of the alleged holding company. R. Doc. 18-1 at 2-4. Though Mead Johnson & Company—the purported manufacturer—owns this trademark, this overlap in naming contributes to the present murkiness of the corporate structure and the necessity for discovery to figure out which of the three Mead Defendants contribute to placing the Subject Formula into Louisiana's stream of commerce. Therefore, when construed in favor of jurisdiction, the Court cannot conclusively determine from Mead Nutrition and Reckitt's evidence and statements that they are completely uninvolved in placing the Subject Formula in the stream of commerce. *See Luv N'care*, 438 F.3d at 469.

The Court observes that there may be merit to the declarations made by Mead Nutrition and Reckitt's corporate representatives that Mead Johnson & Company is the manufacturer of the Subject Formula. These declarations, however, do not totally absolve Mead Nutrition and Reckitt from any involvement with placing the Subject Formula into the stream of commerce in light of both the public-facing overlap in company names and in the public websites which paint Mead Johnson Nutrition and Reckitt as companies that possess some element of control over the Subject Formula. The declarations further do not explain why Plaintiff's website exhibits—notably, a posting on the alleged manufacturer Mead Johnson & Company's parent website—reflect that "Reckitt/Mead Johnson Nutrition" recalled the batches of "Nutramigen Hypoallergenic Infant Formula Powder" instead of the manufacturer, Mead Johnson & Company. *See* R. Docs. 15-2, 15-3. Therefore, taking the evidence in a light most

14

favorable to Plaintiff, the websites and declarations paint a factually complex picture that necessitates discovery to more fully understand each defendant's potential involvement with the Subject Formula.

Beyond the question of whether Mead Nutrition and Reckitt are involved in placing the Subject Formula in the stream of commerce, the Court must assess whether the product was intentionally placed into *Louisiana*'s stream of commerce. Here, Plaintiff must show that Mead Nutrition and Reckitt had an "expectation that [the Subject Formula] would be purchased or used by consumers *in the forum state*." *Ainsworth*, 716 F.3d at 177 (quoting *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987)) (emphasis added). To make this showing, Plaintiff would need to establish that the entities "placed [the] products into the stream of commerce by delivering them to a shipper destined for delivery in" Louisiana.[7] *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 420 (5th Cir. 1993). This foreseeability test is "more relaxed" and is satisfied when "a defendant knowingly benefits from the availability of a particular state's market for its products." *Luv N' care*, 438 F.3d at 470. The Court finds that Plaintiff has also made a prima facie showing that Mead Nutrition and Reckitt could have benefited from Louisiana as a market for the Subject Formula.

Plaintiff's Exhibit A, a webpage seemingly maintained by Mead Johnson & Company's parent company Reckitt Benckiser Group plc, describes the Subject Formula and states that the referenced infant formula is "WIC® eligible in all 50 states." R. Doc. 15-1. Mead Johnson & Company's parent company's website, therefore, represents that the entities responsible for placing the Subject Formula into the stream of commerce intentionally sought to make the Subject Formula WIC® eligible in all

---

[7]     To be clear, Plaintiff's briefing does not construct any distribution network between either Mead Nutrition or Reckitt with other entities for the sale and distribution of the Subject Formula, nor show the exact benefit conferred on either entity resulting from alleged forum-related conduct, nor any evidence of a relationship or agreements between the entities and the Medical Defendants which could evidence that Mead Nutrition or Reckitt could reasonably anticipate being haled into court in Louisiana. *See Allstate Ins. Co. v. Interline Brands, Inc.*, 997 F. Supp. 2d 501, 508 (N.D. Tex. 2014) (comparing and contrasting the evidence relevant to that court's stream-of-commerce analysis with the evidence considered by the Fifth Circuit in *Ainsworth*); *see also Luv N' care*, 438 F.3d at 470-71 (finding specific jurisdiction through the stream-of-commerce theory when the defendant "filled approximately sixty-five purchase orders for items bound for Louisiana and sent invoices . . . confirming same").

fifty states. *Id.* Plaintiff argues that the Mead Defendants benefit from the Subject Formula entering the Louisiana markets due to the "large population of Louisiana citizens on WIC." R. Doc. 15 at 9-10. Liberally construing the evidence in Plaintiff's favor and in favor of jurisdiction, the Court finds that the representation on the webpage satisfies a prima facie showing that the product's entrance into Louisiana was more than random, fortuitous, attenuated, or the unilateral activity of another party or third person.[8] *C.f. Ainsworth*, 716 F.3d at 177.

Overall, Mead Nutrition and Reckitt ask this Court to reach a pre-discovery finding that they are not involved with the Subject Formula. The Court declines to entertain this sort of pre-discovery finding on the basis of their employees' words alone. "A barebones assertion—even one made by a purportedly knowledgeable employee—that is not supported by facts is insufficient to support a motion to dismiss on jurisdictional grounds at this stage in the proceedings." *Doucet v. Abbott Labs., Inc.*, No. No. 25-405, 2025 WL 1548534, at *4 (E.D. La. May 29, 2025) (slip op.) (citing *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985)). The relationships, or lack thereof, between these three entities warrants at least some discovery before Plaintiff's claims are to be dismissed on jurisdictional grounds. *C.f. In re DePuy Ortho., Inc. Pinnacle Hip Implant Prod. Liab. Lit.*, 888 F.3d 753, 778-81 (5th Cir. 2018) (assessing personal jurisdiction post-trial and exercising personal jurisdiction over a parent company when it played a role in the design, promotion, and sales of a product, thus significantly contributing to the product's placement in the stream of commerce). To be clear, though, this finding does not preclude Mead Nutrition and Reckitt from re-challenging the exercise of personal jurisdiction at a later time, either following discovery or trial. *Id.* at 778 ("though [Plaintiff] need only make a *prima*

---

[8]    While the Mead Defendants may not have "actual knowledge or expectation of delivery to" Louisiana, it is reasonably foreseeable that a product that is WIC® eligible in all fifty states will enter Louisiana's stream-of-commerce. *Accord Boat Servs. of Galveston*, 429 F. Supp. 3d at 271, *with Ainsworth*, 716 F.3d 177. Moreover, discovery may reveal targeted efforts of the Mead Defendants to Louisiana's market.

*facie* case at the Rule 12(b)(2) stage, [her] burden escalates to preponderance of the evidence by the end of trial") (internal quotations omitted).

### 2.   Nexus Between Contacts and Cause of Action

Next, Plaintiff must make a prima facie showing that her causes of action arise out of or relate to Mead Nutrition and Reckitt's contacts with Louisiana. *Luv N' care*, 438 F.3d at 472. Mead Nutrition and Reckitt argue that no connection exists at all between their contacts with Louisiana and the subject cause of action because they *do not have* contacts with Louisiana. R. Docs. 7, 8. More specifically, their position is that Plaintiff's "exhibits fail to establish specific jurisdiction over Defendants because Plaintiff's claims do not arise out of these exhibits." R. Doc. 18 at 3. This is an oversimplification. Plaintiff does not appear to submit the three website exhibits because her LPLA claims are based on a recall of the Subject Formula. *See* R. Docs. 3-1, 15. These exhibits appear to instead serve as evidence that Mead Nutrition and Reckitt may be involved with placing the Subject Formula into the stream of commerce by being somehow involved in the product's recall. *See* R. Docs. 15-2, 15-3.

Plaintiff avers that this cause of action arises out of the Mead Defendant's contacts with Louisiana because the "Medical Providers, licensed to practice in Louisiana, prescribed the [Subject Formula] to [Plaintiff's son] in Louisiana, and its use led to [his] untimely death." R. Doc. 15 at 10. The Court agrees. If Mead Nutrition and Reckitt, for example, made efforts to make the Subject Formula WIC® eligible in all fifty states, anticipating the Subject Formula to be sold and consumed in all fifty states, then Plaintiff's son's consumption of the Subject Formula would naturally arise out of their minimum contacts with Louisiana. Plaintiff has made a prima facie showing that the cause of action arises out of Mead Nutrition and Reckitt's potential minimum contacts with Louisiana through the stream-of-commerce theory.

### 3.  Fair and Reasonable to Exercise Jurisdiction

Since Plaintiff has met her prima facie burden, Defendants have a chance to rebut by showing that this Court's exercise of jurisdiction would "offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). "It is rare to say the assertion is unfair after minimum contacts have been shown." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) (citing *Akro Corp. v. Luker*, 45 F.3d 1541, 1549 (5th Cir. 1995)). Courts assess this by considering (1) the burden on the defendant, (2) the interests of the forum State, (3) the plaintiff's interest in convenient and effective relief, (4) the interstate judicial system's interest in obtaining efficient resolution of controversies, and (5) the shared interests of the States in furthering fundamental substantive social policies. *Asahi Metal Indus. Co. v. Sup. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987) (citing *World-Wide Volkswagen*, 444 U.S. at 292); *Ruston Gas*, 9 F.3d at 421.

Mead Nutrition and Reckitt each argue that it would be burdensome for them to litigate this case in Louisiana when their domiciles and principal places of business are in other states. R. Doc. 7-1 at 8; R. Doc. 8-1 at 8. They each aver that Louisiana's interest in adjudicating this case against them is weakened since they have no role in the controversy, as neither of them promote or manufacture the Subject Formula. R. Doc. 7-1 at 8; R. Doc. 8-1 at 8. Plaintiff counters by arguing that the burden to litigate in this forum is nonexistent since Mead Nutrition and Reckitt campaigned, advertised, and distributed the Subject Formula in Louisiana, and that there would be a significant burden on Plaintiff to litigate this matter in a place other than where the alleged injuries occurred. R. Doc. 15 at 11. She further argues that Louisiana has a significant interest in adjudicating this case—moreso than any of the domicile or principal place of business States—because the sale of, consumption of, and damages allegedly caused by the Subject Formula all occurred in Louisiana. *Id.*

The Court agrees with Plaintiff. Generally, "where a product allegedly causes economic injury in Louisiana, it is in the interest of that state to have its courts mediate the dispute." *Luv N' care*, 438 F.3d at 474; *see also Ruston Gas*, 9 F.3d at 421 ("It is not unfair or unjust to require the manufacturer of a good that is knowingly delivered to a specific state to respond to a lawsuit arising out of defects in a good in that state."). Mead Nutrition and Reckitt have not submitted evidence to suggest that litigating this action here, where the injury occurred, would be unjust—other than their representation that they should not be in this suit at all because they are not the manufacturers of the Subject Formula. R. Doc. 18 at 7. But as the Court has explained, Plaintiff made her prima facie showing that the companies may have been involved with the Subject Formula, and until discovery reveals otherwise, this Court will exercise specific jurisdiction over Mead Nutrition and Reckitt.

### C. Mead Defendants' Motion to Dismiss for Failure to State a Claim.

The Court will now turn to address whether Plaintiff plausibly pled each of her theories of liability against the Mead Defendants. Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 556. A claim is plausible on its face when the plaintiff has pled facts that allow the court to "draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 570. A court must liberally construe the complaint in light most favorable to the plaintiff, accept the plaintiff's allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). However, courts "do not accept as true conclusory allegations, unwarranted factual inferences,

or legal conclusions." *Arias-Benn v. State Farm Fire & Cas. Co.*, 495 F.3d 228, 230 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)).

Because the Court is sitting in diversity, it is bound by the substantive law of Louisiana, the forum state. *Learmonth*, 710 F.3d at 258. The Louisiana Products Liability Act provides the "exclusive theories of liability for manufacturers for damage caused by their products." LA. REV. STAT. § 9:2800.52. Manufacturers are liable for "damage proximately caused by a characteristic of a product that renders it unreasonably dangerous when such damage arose from a reasonably anticipated use of the product." *Id.* at § 9:2800.54A. A product "is unreasonably dangerous" under the LPLA "if and only if" it is unreasonably dangerous in any of the following four ways: (1) "in construction or composition," (2) "in design," (3) because "an adequate warning . . . has not been provided," and (4) because the product "does not conform to a[ manufacturer's] express warranty." *Id.* at 9:2800.54B. An unreasonably dangerous condition cannot be presumed just because an injury occurred, and the plaintiff bears the burden of proving each element of the four LPLA theories. *Baudin v. AstraZeneca Pharm. LP*, 413 F. Supp. 3d 498, 503 (M.D. La. 2019).

Here, Plaintiff brings claims against the Mead Defendants under all four LPLA theories of liability. R. Doc. 3-1. The Mead Defendants now move to dismiss each of them. R. Doc. 6. First, Mead Defendants argue that the LPLA provides the exclusive remedy for Plaintiff's recovery, so her claims for non-LPLA negligence, as well as redhibition based on noneconomic losses, should be dismissed. R. Doc. 6-1 at 1. Second, they contend that Plaintiff's Petition is not pled with the level of specificity required under federal law to show that she is entitled to relief on any theory. *Id.* at 2.

The Court will first address that the LPLA provides Plaintiff's exclusive remedy in tort and will thereafter address the pleading adequacy of each of the four LPLA liability theories in turn. It concludes by addressing Plaintiff's redhibition claims and the doctrine of *res ipsa loquitur*.

### a. The LPLA Is the Exclusive Remedy in Tort

The Louisiana legislature expressly limited the kinds of claims that citizens could bring against manufacturers when it enacted the LPLA. LA. REV. STAT. § 9:2800.52. "While the statutory ways of establishing that a product is unreasonably dangerous are predicated on principles of strict liability, negligence, or warranty, respectively, neither negligence, strict liability, nor breach of express warranty is any longer viable as an independent theory of recovery against a manufacturer." *Jefferson v. Lead Indus. Ass'n, Inc.*, 930 F. Supp. 241, 245 (E.D. La. 1996), *aff'd*, 106 F.3d 1245 (5th Cir. 1997). Therefore, any non-LPLA negligence claims must be dismissed because they are no longer cognizable under Louisiana law. *Cooper v. Wyeth*, No. 09-929, 2010 WL 2653321, at *2 (M.D. La. June 25, 2010). To the extent Plaintiff's Petition attempts to plead non-LPLA negligence claims, they must be dismissed.

With this in mind, the Court now turns to address the four liability theories provided for in the LPLA and whether Plaintiff has adequately pled the facts necessary to bring all four claims.

### i. Construction Defect

Plaintiff brings a construction defect claim pursuant to La. R.S. § 9:2800.55, arguing that the construction or composition of the Subject Formula made it unreasonably dangerous. R. Doc. 3-1 at 7-8. To establish this claim, she must plausibly plead that (1) the defendant is the manufacturer of the product, (2) the product proximately caused plaintiff's damages, (3) the damaging characteristic rendered the product unreasonably dangerous in its construction or composition, and (4) the damages arose from a reasonably anticipated use of the product. *Lewis v. Baxter Int'l, Inc.*, No. 16-16391, 2017 WL 661324, at *3 (E.D. La. Feb. 17, 2017). For the third element, Plaintiff must establish that "at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance

21

standards for the product or from otherwise identical products manufactured by the same manufacturer." LA. REV. STAT. § 9:2800.55.

Plaintiff alleges that the Subject Formula deviated in a material way from the Mead Defendants' specifications or performance standards in at least three ways. R. Doc. 3-1 at 7-8. First, she asserts that the Subject Formula "failed to provide a nutritious, safe alternative to breast milk and/or cow's milk." *Id.* at 7. Second, she contends that the Subject Formula "was not free from defects." *Id.* And third, Plaintiff avers that there could be "some other failure" of the Subject Formula, and the information evidencing the same is "within the sole possession of the Mead Defendants." *Id.* at 8.

Defendants contend that these facts do not establish that the ingredients in or manufacturing of the Subject Formula consumed by Plaintiff's child was any different from other packages of the Subject Formula. R. Doc. 6-1 at 6. The Court finds, however, that Plaintiff's first allegation gives rise to the inference that the product materially deviated from the production specifications or performance standards when the product left the manufacturer's control. Embedded in this allegation is that the Subject Formula—when manufactured properly—*would* provide a safe alternative to breast/cow's milk and not lead to the consuming infant's death if manufactured to the Mead Defendants' normal manufacturing standards. When construed liberally in Plaintiff's favor, her allegation also suggests that the Subject Formula did not provide her son with the "nutritious, safe alternative to breast milk and/or cow's milk" that other properly manufactured canisters of the Subject Formula presumably provided to other infants. *See Guidry v. Janssen Pharms., Inc.*, 206 F. Supp. 3d 1187, 1197-98 (E.D. La. 2016) (dismissing plaintiff's construction defect claim when the amended complaint failed to assert that the particular medication she took

materially deviated from its intended design and instead contrasted its performance standards against other similar medications).

The second and third assertions listed in Plaintiff's Petition are the sort of conclusory, element-reciting statements that would not allow her claims to survive at the 12(b)(6) stage. *Arias-Benn*, 495 F.3d at 230. However, Plaintiff's first allegation provides enough information to raise a reasonable expectation that discovery will reveal evidence to support that the Mead Defendant may be liable for her injuries. *See Dover Bay Specialty Ins. Co. v. LG Elecs. U.S.A., Inc.*, No. 21-26, 2021 WL 5508513, at *5 (E.D. La. Mar. 25, 2021). As Plaintiff will be given the opportunity to amend her Petition, she will have the opportunity to plead additional facts that, together with her first allegation, may further allow her construction defect claim to survive at the motion to dismiss stage.

### ii.  Design Defect

A design defect claim under the LPLA requires a claimant to sufficiently plead that "(1) [t]here existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) [t]he likelihood that the product's design would cause the claimant's damage . . . outweighed the burden on the manufacturer of adopting such an alternative design." LA. REV. STAT. § 9:2800.56. Conclusory assertions that an alternative design exists will not suffice to meet plaintiff's burden; plaintiff must identify an alternative design with *some* level of specificity, though courts are mindful that the plaintiff does not have the benefit of discovery at this stage. *Baudin*, 413 F. Supp. 3d at 507 (discussing cases wherein courts have found that "a complaint sufficiently pleads a design defect claim by alleging an alternative design in general terms, including the general characteristics of the alternative design").

Defendants contend that Plaintiff "relies on nothing but statutory buzz words" and/or are "clearly legal conclusions." R. Doc. 6-1 at 8. Plaintiff avers that she has pled enough to support a

design defect theory, specifically pointing the Court to her allegation that Mead Defendants' design of the Subject Formula caused it to "fail[] to provide nutrients to" her son, ultimately causing his death, and that it "otherwise failed during its reasonably anticipated use." R. Doc. 14 at 5 (citing R. Doc. 3-1 at 8). She also cites to a later *Flagg v. Stryker Corp.* opinion, wherein the Fifth Circuit explained that requiring plaintiffs like her to "plead extremely 'detailed factual allegations' that satisfy each element of a products liability action under the LPLA creates a situation where a manufacturer will not be held liable for defective products because it has sole possession of the necessary document to ultimately prove the claim." 647 F. App'x 314, 317 (5th Cir. 2016).

Here, the Court finds that Plaintiff's allegations are too bare to give rise to the inference that alternative designs were available, and that the danger of damage outweighed the burden of adopting the alternative design. First, Plaintiff does allege that the Subject Formula "failed to provide nutrients" and "caused [her son's] death." R. Doc. 3-1 at 8. She further states that "[m]ost infant formulas sold and distributed in the United States do not fail, proving that a safer design exists." R. Doc. 3-1 at 8. But this, without more, will not give rise to the inference that an alternative design exists because "the existence of alternate products does not demonstrate the existence of a specific alternate design." *Robertson v. AstraZeneca Pharms., LP*, No. 15-438, 2015 WL 5823326, at *4 (E.D. La. Oct. 6, 2015). And because Plaintiff failed to allege with enough specificity that an alternative design exists, "it is impossible for the [petition] to have sufficiently alleged the second element of a design defect claim, which involves a balancing test between the gravity of the damage the product would cause as currently designed and the burden and effects of adopting the alternative design." *Kennedy v. Pfizer, Inc.*, No. 13-3132, 2014 WL 4092918, at *4 (W.D. La. Aug. 15, 2014).

Courts in this circuit have allowed design defect claims to survive when complaints allege "general characteristics of the alternative design." *Baudin*, 413 F. Supp. 3d at 606 (collecting and explaining cases). In *Baudin v. AstraZeneca Pharmaceuticals*, the court explained that the complaint sufficiently alleged an alternative design of a medication when plaintiff pled that other medications existed to target his medical ailment and that those other medications did not produce the side effects that he experienced from the medication he took. *Id.* at 504-05. There, Plaintiff included in the complaint names of other drugs that treated his medical condition, details about the designs of those medications, and general information about how the drug that allegedly caused his injuries differed from those other medications. *Id.* Here, Plaintiff does not plead anything similar that could generally describe an alternative design. A court "do[es] not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). So even though plaintiffs are not required to plead "very detailed and specific allegations . . . at this stage, before . . . an opportunity for discovery," Plaintiff here has only pled the barebones legal elements of a design defect claim, which is not enough to satisfy even this forgiving standard. *Flagg*, 647 F. App'x at 318.

Plaintiff's reliance on *Flagg* also does not assist her claim. In *Flagg*, the plaintiff pled that a different, better-performing metal could have been used in the manufacturing of his medical device implant. *Id.* at 318. This pleading allowed the court to come to the inference that the plaintiff there "suffered[] due to the . . . use of a poorly-performing [metal] alloy, instead of a different metal alloy and design" which were available at the time the plaintiff's implant device was manufactured. *Id.* Therefore, the *Flagg* plaintiff alleged enough information to allow the Court to infer that alternative materials and designs were available when his medical implant was produced. *Id.*

25

Here, Plaintiff does not identify any aspects of the Subject Formula, even in general terms, that could give rise to the inference that its design caused her son's death. *See Brooks v. Amgen, Inc.*, No. 18-657, 2019 WL 507491, at *5 (M.D. La. Feb. 8, 2019) (allowing design defect claim to survive 12(b)(6) motion when plaintiff alleged that an aspect of the design of a medication was known to cause bone necrosis and that the manufacturer knew this when designing and manufacturing the medication). Plaintiff merely claims that other infant formulas on the market "do not fail." *See Robertson*, 2015 WL 5823326, at *4 (dismissing design defect claim when the complaint described the existence of numerous alternative over-the-counter medications, but did not explain how the design of the particular drug plaintiff took contributed to her injuries).

However, this Court notes that "in products liability lawsuits, almost all of the evidence is in the possession of the defendant, and, therefore, it is likely impossible for plaintiffs to state more specific allegations regarding defects in manufacture and design." *Bertrend v. Eli Lilly & Co.*, No. 12-853, 2013 WL 4093556, at *5 (W.D. La. Aug. 13, 2013). This Court, therefore, will allow Plaintiff leave to amend her Petition in order to more fully allege a design defect claim or ultimately decide to not pursue this liability theory.

### iii. Failure to Warn

The next theory that Plaintiff asserts in arguing that the Subject Formula is unreasonably dangerous is that "an adequate warning about the product ha[d] not been provided." LA. REV. STAT. § 9:2800.57; R. Doc. 3-1 at 8. "To maintain a failure-to-warn claim, a plaintiff must demonstrate that 'the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.'" *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 261 (5th Cir. 2002) (quoting LA. REV. STAT. § 9:2800.57). An "adequate warning" is "a warning or instruction that

would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the danger for which the claim is made." LA. REV. STAT. § 9:2800.53(9).

Notably, a manufacturer is liable for inadequate warnings "only if the defect proximately caused the plaintiff's injury." *Baudin*, 413 F. Supp. 3d at 507. Plaintiffs bear the burden of proving that but-for the inadequate warning, the underlying injury would not have occurred. *Id.* But this failure-to-warn "does not extend to dangers that are or should be obvious or common knowledge to the ordinary user or handler of the product." *Colbert v. Sonic Rests., Inc.*, 741 F. Supp. 2d 764, 770 (W.D. La. 2010) (citing LA. REV. STAT. § 9:2800.57B).

Defendants' position is that Plaintiff again only recited the barebones legal elements of her claim. R. Doc. 6-1 at 11. The Court agrees. Plaintiff's Petition alleges that:

> The Mead Defendants failed to use reasonable care to provide an adequate warning that the Subject Infant Formula possessed a characteristic that may cause damage and danger to its' [sic] users and handlers. The dangerous characteristics of the Subject Infant Formula were its propensity not to provide nutrients safely and cause invasive diseases, infections, and death. The Mead Defendants provided no warning that the Subject Infant Formula possessed this dangerous characteristic.

R. Doc. 3-1 at 8. Plaintiff does generally allege that the Subject Formula possessed a damage-causing characteristic—i.e., some aspect of the Subject Formula allegedly caused it to fail to provide nutrients to her son and/or caused its consumption to result in disease, infection, and/or death. These facts do plausibly establish that the Subject Formula had a damage-causing characteristic, but the pleadings fail to allege sufficient facts to give rise to the inference that the inadequate warning was the proximate cause of her son's death. *Stahl*, 283 F.3d at 261.

For example, Plaintiff explained in her Petition some of the medical challenges faced by her son before his death, including suffering from "dry mucous membranes, bradycardia,

intermittent spontaneous respiration" and more. R. Doc. 3-1 at 5. But she does not take the next step and link any of her son's medical ailments to the warnings, or lack thereof, on the Subject Formula's label. *E.g.*, *Bjorklund v. Novo Nordisk A/S*, 705 F. Supp. 3d 636, 641 (W.D. La. 2023) (finding plaintiff adequately pled a failure-to-warn claim when she alleged that her particular medical ailment was not warned about on the label).

This Court's want for facts regarding causation is supported by similar cases. For example, in *Guidry v. Janssen Pharmaceuticals, Inc.*, the court found that plaintiff sufficiently alleged a failure to warn claim when she stated that the "warnings regarding [the drug] were inadequate in light of the high risks of taking the drug." 206 F. Supp. 3d at 1198-99. There, the plaintiff included in her complaint medical statistics showing an alleged correlation between the drug she took and the ailment she suffered. *Id.* Though medical statistics are not necessarily required to be included in a complaint, this Court notes that the plaintiff in that case took her factual allegations one step further than simply stating that there was no warning on the drug's label that was relevant to the suffered injury.

Many cases from this Circuit that address the pleading adequacy of failure-to-warn claims grapple with the learned intermediary doctrine. *E.g.*, *Baudin*, 413 F. Supp. 3d at 507-08; *Bjorklund*, 705 F. Supp. 3d at 641; *Celino v. Biotronik, Inc.*, 536 F. Supp. 3d 89, 108 (E.D. La. April 29, 2021). Overall, the sentiment gleaned from these cases reveals that courts in this circuit require more from a complaint than the sole assertion that the label "provided no warning" with no other facts. *See* R. Doc. 3-1 at 8. It is apparent that in those cases, plaintiffs are not required to provide "details on what an adequate warning would be and how an adequate warning would have required Plaintiff's treating physicians to act differently." *Baudin*, 413 F. Supp. 3d at 510 (quoting *Jenkins v. Bristol-Myers Squibb*, No. 14-2499, 2015 WL 5012130 (E.D. La. Aug. 21, 2015)). But plaintiffs who

survive at the motion to dismiss stage, for example, tend to explicitly allege that "had Defendants issued an adequate warning, Plaintiff's physicians could have discussed the risks . . . with Plaintiff." *Id.* Similarly, in *Bjorklund v. Novo Nordisk A/S*, the court found that plaintiff's failure to warn claim survived a motion to dismiss because she pled that a medication's warning was inadequate because it failed to include her specific alleged side effect and/or the potential severity of similar side effects in the label's list of potential side effects. 705 F. Supp. 3d at 641. There, plaintiff also specifically alleged that her physician would not have prescribed the medication if equipped with an adequate warning. *Id.*

These cases assist the Court in determining that Plaintiff here has not plausibly pled her failure-to-warn case when she just alleges that the Mead Defendants "provided no warning" that the Subject Formula had the "propensity not to provide nutrients safely and cause invasive diseases, infections, and death." R. Doc. 3-1 at 8. To be clear, "the sufficiency of the warning is not before the Court at the motion to dismiss stage." *Baudin*, 413 F. Supp. 3d at 509. But a plaintiff must plead sufficient facts to allow the Court to draw an inference that the alleged dangerous characteristic of the Subject Formula was inadequately warned about on the label, and Plaintiff's allegation that the label contains "no" warning about the Subject Formula's "propensity not to provide nutrients safely and cause invasive diseases, infections, and death" is not the kind of pleading that "raises a right to relief" on her failure-to-warn claim "above a speculative level." *Twombly*, 550 U.S. at 555.

This Court is mindful that the question before it is whether Plaintiff has "plausibly alleged enough information that, *with discovery*, [s]he could prove the Manufacturing Defendants are liable under the LPLA." *Flagg*, 647 F. App'x at 319. At present, Plaintiff's Petition fails to sufficiently allege causation and adequate factual assertions that could allow the Court to see that,

29

with discovery, Plaintiff may be able to establish a failure-to-warn claim against the Mead Defendants. But, as noted previously, Plaintiff will receive an opportunity to amend her Petition and may choose to add additional allegations to plead her failure-to-warn claim if she chooses to pursue this theory. *See Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) ("a plaintiff's failure to meet the specific pleading requirements should not automatically or [inflexibly] result in dismissal of the complaint with prejudice . . . unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so").

### iv. Breach of Express Warranty

Plaintiff's final LPLA claim is that the Subject Formula is unreasonably dangerous because it does not conform to an express warranty that the product "was sufficient and sustainable for doctors to prescribe to premature infants." R. Doc. 3-1 at 8-9. Under Louisiana law, products are unreasonably dangerous when they do not conform to "an express warranty made at any time by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue." LA. REV. STAT. § 9:2800.58. An express warranty is defined as "a representation, statement of alleged fact or promise about a product or its nature, material or workmanship that represents, affirms or promises that the product or its nature, material or workmanship possesses specified characteristics or qualities or will meet a specified level of performance." LA. REV. STAT. § 9:2800.53(6). Notably, "'Express Warranty' does not mean a general opinion about or general praise of a product." *Id.*

To plead a claim for a breach of express warranty under the LPLA, Plaintiff must establish that "(1) the manufacturer made an express warranty regarding the product, (2) the plaintiff was induced to use the product because of that warranty, (3) the product failed to conform to that

express warranty, and (4) the plaintiff's damage was proximately caused because the express warranty was untrue." *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 452 (5th Cir. 2002). Defendants argue that Plaintiff's Petition does not plausibly allege these four elements by failing to specify which alleged warranty "is even applicable or whether it was in fact breached." R. Doc. 6-1 at 13. They also take the position that Plaintiff did not identify "the specific materials where the warranties appear." *Id.*

Plaintiff cites to *Boutte v. Stryker Biotech, LLC*, 67 F. Supp. 3d 732 (M.D. La. 2014) and argues that she, like the Plaintiff in that case, pled that Mead Defendants engaged in a "broad scheme" to "promote[] and induce[] the purchase of the infant formula to the general public, the medical facilities and Plaintiff through" advertisements and the like. R. Doc. 14 at 7. The Court disagrees with Plaintiff's representation that she pled similar facts to those pled by the plaintiff in *Boutte*.

In *Boutte*, the court found that the plaintiff sufficiently alleged that the manufacturers of a medical product engaged in a broad promotional marketing scheme that went beyond general praise of the product and rose to the level of an express warranty. *Boutte*, 67 F. Supp. 3d at 739. There, the plaintiff's petition asserted that the manufacturer "promoted [the product] as the 'preferred' and 'perfect'" product that could mix with a different medical product safely. *Id.* He then stated in his complaint that the manufacturer "assur[ed] the medical community" of the product's safety "while knowing that the combined use of the products remained untested, ineffective, and unsafe." *Id.* Further, the *Boutte* plaintiff explicitly pled that his surgeon relied on the manufacturer's assurances when deciding whether to use the materials in plaintiff's surgery. *Id.* Altogether, that court found that the plaintiff had pled enough facts to give rise to the inference that the manufacturer could be liable for making and breaching express warranties. *Id.*

31

Here, unlike the Plaintiff in *Boutte*, Plaintiff does not plead sufficient facts to give rise to the inference that Mead Defendants engaged in a widespread marketing scheme of the Subject Formula that could be inferred to rise to the level of an express warranty. Her Petition simply asserts that:

> The Mead Defendants expressly warranted through instructions, packaging labeling, and other materials that the Subject Infant Formula was free from defects in material and workmanship and for the ordinary purpose of infant formulas.
>
> In order to promote and induce the purchase of their product, the Mead Defendants [advertised] . . . that consumers, like Plaintiff, and medical staff could safely use the Subject Infant Formula for its intended purpose.
>
> The Mead Defendants' express warranties were part of the bargain, and Plaintiff relied upon their representation and warranty that the Subject Infant Formula was free from defects.

R. Doc. 3-1 at 8-9. The above assertions are not analogous to the scheme pled by the plaintiff in *Boutte*. Instead, Plaintiff's allegations of the Mead Defendant's representations about the Subject Formula are more like "a general opinion about or general praise of a product," which Louisiana law states does not amount to an express warranty. LA. REV. STAT. § 9:2800.53(6). The Court cannot infer from the above allegations that the Mead Defendants held their product out to be the "gold standard" in infant formula, for example, "while knowing that the . . . product[] remained untested, ineffective, and unsafe." *Boutte*, 67 F. Supp. 3d at 739.

It is true that "plaintiffs are not required to identify specific language offered by a manufacturer" in order to allege a breach of express warranty claim. *Kennedy*, 2013 WL 4590331, at *5. It is also "unnecessary for Plaintiff to cite to a specific express warranty" for her allegations to survive. *Baudin*, 413 F. Supp. 3d at 511. Additionally, the court in *Baudin* could not find, nor can this Court, any "binding or persuasive authority that the express warranty must appear in a certain location and/or that Plaintiff must specifically allege where the warranties appear." *Id.* at

512. Even with these seemingly forgiving touchpoints, the federal pleading standards call for more than what is offered by Plaintiff. "While this Court acknowledges that it is unnecessary for [Plaintiff] to cite a specific express warranty, it is necessary to articulate how the equivalent marketing materials are false." *Kennedy*, 2013 WL 4590331, at *5 (noting that plaintiffs "did not specifically explain that the content of [defendant's] promotion contradicted what it knew or should have known to be true" about the product).

For example, Plaintiff does not assert that the "defendants expressly warranted that [the Subject Formula] had been adequately tested" as well as safe for consumption. *Guidry*, 206 F. Supp. 3d at 1199. Nor does she allege facts to support an inference that the "marketing appears to rise to the level of an express warranty [because] th[e] marketing makes claims as to the product's safety." *Kennedy*, 2013 WL 4590331, at *5. The Petition also does not state that the Mead Defendants marketed and promoted the Subject Formula "as safe and effective while simultaneously having knowledge that [the Subject Formula] has been allegedly associated with" any of the maladies Plaintiff asserts can result from ingesting the Subject Formula. *Baudin*, 413 F. Supp. 3d at 512. Nor does plaintiff accompany her plea of the Subject Formula's express warranty of its safety with "specific allegations of the side effects of [the Subject Formula] that made it unsafe and unacceptable, and details[/]allegations of the correlation between [the Subject Formula] and [a specific medical ailment]." *Id.*

The foregoing examples should not be interpreted as stringent requirements for Plaintiff here to plead in order for her breach of express warranty claim to survive. Instead, these examples should serve as guideposts that the federal pleading standards require more than a bare recital of the elements. Overall, courts in this circuit require plaintiffs to allege more specific facts than what Plaintiff has alleged here to show that Defendants made an express warranty beyond generally

praising their own product. *Lewis v. Baxter Int'l, Inc.*, No. 16-16391, 2017 WL 661324, at *5 (E.D. La. Feb. 17, 2017). This Court will provide Plaintiff the opportunity to amend her Petition and choose whether to abandon her express warranty claim or plead additional facts that could allow it to survive.

### b. Redhibition

The Court now turns to other theories asserted in Plaintiff's Petition beyond the LPLA. As discussed, the LPLA extinguishes all possible causes of action beyond the four above-analyzed theories—except for redhibition claims. Redhibition is specifically carved out of the definition of "damage" in La. Rev. Stat. § 9:2800.53(5). "[T]he statute defines 'damage' by explicitly excluding amounts recoverable under redhibition for damage to the product and other economic loss." *De Atley v. Victoria's Secret Catalogue, LLC*, 2004-0661 (La. App. 4 Cir. 5/14/04), 876 So. 2d 112, 115. Therefore, redhibition claims are permissible "only to the extent the claimant seeks to recover the value of the product or other economic loss." *Id.* Therefore, like Plaintiff's non-LPLA tort claims, the Court must dismiss any redhibition theories advanced by Plaintiff which seek recovery for tort damages or other nonpecuniary losses. *Jefferson*, 930 F. Supp. at 245.

Under Louisiana law, a buyer has a warranty that there are no "redhibitory defects, or vices, in the thing sold." La. Civ. Code art. 2520. A defect is redhibitory when it either "renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect" or when "without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price." *Id.* "The degree of the seller's liability varies according to whether the seller knew of the defect[, and if] he did not know of the defect, the seller must have an opportunity to cure the defect, either through repair or replacement." *Chevron USA, Inc. v. Aker*

*Maritime, Inc.*, 604 F.3d 888, 899 (5th Cir. 2010). Therefore, to assert her claim in redhibition, Plaintiff must sufficiently plead that "(1) the thing sold is either absolutely useless for its intended purpose or its use is so inconvenient or imperfect that had the buyer known of the defect, he or she would not have purchased it;" "(2) at the time of the sale, the thing sold contained a defect that was neither known nor apparent to the buyer;" and "(3) the seller was afforded an opportunity to repair the defect." *Dover Bay*, 2021 WL 5508513, at *5.

Mead Defendants assert that Plaintiff has not pled her redhibition claim with the level of specificity required by the federal rules. R. Doc. 6-1 at 13-15. The Petition plainly states that "The Mead Defendants are also liable under Louisiana's law of redhibition" without further factual development in the immediate surrounding paragraphs. *See* R. Doc. 3-1 at 9. The Mead Defendants therefore contend that the Petition fails to allege information on the seller who sold the allegedly redhibitory item, how the Subject Formula was useless for its intended purpose and/or was so inconvenient under the reasonable person standard, details about the non-apparent defect, and that the seller had the opportunity to cure. R. Doc. 6-1 at 14. Plaintiff does not address her redhibition claim in her opposition. *See* R. Doc. 14.

At the outset, the Court observes that Plaintiff does not request economic damages in her Petition. *C.f. Baudin*, 413 F. Supp. 3d at 514 (explaining that "Plaintiff pleads not only the essential elements of a redhibition claim, but also seeks the appropriate relief of economic damages"). But because the Court "has found that the plaintiff has satisfied the pleading standard to plausibly make out" one of her four LPLA claims based on her state court Petition, the Court finds that Plaintiff has "alleg[ed] the most basic legal elements of a redhibition claim against [the Mead Defendants] but not any specific facts supporting these elements." *Dover Bay*, 2021 WL 5508513, at *5. Therefore, like other courts in this district, the Court will allow Plaintiff the opportunity to allege

further facts relevant to her redhibition claim in an amended complaint and clarify, among other things, whether she is seeking economic damages. *See id.*; *see also Guidry*, 206 F. Supp. 3d at 1200 ("Because the Court has found that the plaintiff has satisfied the pleading standard to plausibly make out a claim for defect in design and inadequate warning, those alleged defects are doctrinally redhibitory as well.").

### c.   Res Ipsa Loquitur

Mead Defendants argue that Plaintiff has failed to adequately plead how the doctrine of *res ipsa loquitur* applies. R. Doc. 6-1 at 16. Plaintiff does not address this in her opposition. *See* R. Doc. 14. Her Petition states that she "expressly pleads the doctrine of *res ipsa loquitur* and, further, expressly pleads that the particulars surrounding the [Subject Formula] . . . are exclusively within the Mead Defendants' control." R. Doc. 3-1 at 9. Mead Defendants state that the foregoing "fails to . . . exclude the inference of Plaintiff's own responsibility, the responsibility of others, other infant formulas provided to her child, or natural causes causing her infant son's alleged injuries." R. Doc. 6-1 at 16.

The Louisiana Supreme Court has specifically held that the doctrine of *res ispa loquitur* can be applied in products liability actions so that a plaintiff can "use circumstantial evidence in order to make the inference that a product was unreasonably dangerous when that product left a manufacturer's control." *Lawson v. Mitsubishi Motor Sales of Am., Inc.*, 2005-0257 (La. 9/6/08), 938 So. 2d 35, 49. Plaintiffs must generally establish three things for this doctrine to apply: (1) that "plaintiff's injuries would not have occurred in the absence of negligence;" (2) "that the defendant's negligence falls within [its] scope of duty to plaintiff;" and (3) that other "evidence should sufficiently exclude inference of the plaintiff's own responsibility or the responsibility of

others besides defendant in causing the accident." *Id.* (citing *Cangelosi v. Our Lady of the Lake Reg'l Med. Ctr.*, 564 So. 2d 654, 666 (La. 1989)).

"The doctrine of *res ipsa loquitur* is circumstantial evidence, not substantive law," from which negligence can be inferred. *Temes v. Manitowoc Corp.*, 14-93 (La. App. 5 Cir. 12/23/14), 181 So. 3d 733, 740. Courts in this circuit have noted that the purpose of the doctrine is "to relieve the plaintiff of the burden of proving a specific act of negligence by the defendant when it is impossible for the plaintiff to determine the sequence of events, or when the defendant has superior knowledge or means of information to determine the cause of the accident." *Flores v. Furniture Indus. Servs., Inc.*, No. 24-CV-195, 2025 WL 2116371, at *4 (W.D. Tex. July 10, 2025) (slip op.) (quoting *Bellamy v. Ford Motor Co.*, No. 22-CV-00941, 2025 WL 35885, at *7 (W.D. Tex. Jan. 6, 2025)). Plaintiff has pled that she is invoking the doctrine, at the very least, because "the particulars surrounding the [Subject Formula] . . . are exclusively within the Mead Defendants' control." R. Doc. 3-1 at 9. Therefore, the Court finds that Plaintiff properly invoked the doctrine at the motion to dismiss stage. *See also Kruse ex rel. D.B. v. United States*, No. 17-CV-947, 2018 WL 4677896, at *3 (W.D. Tex. June 5, 2018), *report and recommendation adopted*, 2018 WL 4701806 (W.D. Tex. July 31, 2018) ("Whether *res ipsa loquitur* is applicable to this case is an evidentiary issue best left for summary judgment."). As Plaintiff will have the opportunity to amend her Petition, she has the choice to further develop her invocation of this doctrine.

### D. Opportunity to Amend Petition.

Courts should ordinarily grant a Plaintiff at least one opportunity to amend before dismissing a complaint with prejudice for a failure to state a claim. *Hart v. Bayer Corp.*, 199 F.3d at 247 n.6; *see also Dover Bay*, 2021 WL 5508513, at *5 (granting leave to amend when plaintiff had not yet alleged sufficient information to raise a reasonable expectation that discovery will

reveal evidence to support defendant's liability but found that the plaintiff had shown the possibility that it could correct the deficiencies). Accordingly, the Court will afford Plaintiff thirty (30) days to amend her Petition to address the factual deficiencies addressed throughout this Order & Reasons.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Plaintiff's Motion to Stay Proceeding Pending Medical Panel Review and Alternative Motion to Remand, R. Doc. 13, is **DENIED**.

**IT IS FURTHER ORDERED** that the Medical Defendants' Motion to Dismiss for Failure to State a Claim, R. Doc. 12, is **GRANTED**. Plaintiff's claims against the Medical Defendants are hereby dismissed without prejudice.

**IT IS FURTHER ORDERED** that the Motions to Dismiss for Lack of Personal Jurisdiction filed by Mead Nutrition and Reckitt, R. Docs. 7, 8, are **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the Mead Defendants' Motion to Dismiss pursuant to Rule 12(b)(6), R. Doc. 6, is **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff is granted leave to file an amended complaint no later than thirty days from the date of this Order. Defendants shall have a right to re-urge if they see fit following the entry of the Amended Complaint.

New Orleans, Louisiana, this 8th day of September, 2025.

THE HONORABLE ELDON E. FALLON