## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **NIKOLETTE HOBBS, individually and on behalf of her deceased child, NOAH PATRICK HOBBS** | * | **CIVIL ACTION NO. 25-224** |
| | * | **JUDGE ELDON E. FALLON** |
| **VERSUS** | * | **MAGISTRATE JUDGE** |
| | * | **KAREN WELLS ROBY** |
| **PEDIATRIC KID-MED, LLC, DERGAL FAY BURBANK, M.D., MPH, RAJESH K. SHARAMA, M.D., F.A.A.P., MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, AND RECKITT BENCKISER GROUP, LLC** | * | |

\*       \*       \*       \*       \*       \*       \*       \*

## <u>ORDER & REASONS</u>

Before the Court is a motion to dismiss the amended complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure filed by Defendants Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Reckitt Benckiser LLC (collectively "Defendants"). R. Doc. 29. Plaintiff Nikolette Hobbs, individually and on behalf of her deceased child Noah Patrick Hobbs, opposed the motion. R. Doc. 33. Defendants replied. R. Doc. 34. Considering the record, briefing, and applicable law, the Court now rules as follows.

## I.    BACKGROUND

This products liability case arises from the death of Plaintiff's infant son. The amended complaint details that Plaintiff's son, Noah, was born prematurely on September 13, 2023, with a low birth weight. R. Doc. 25 at 10.  To increase his weight, he was fed breast milk fortified with infant formula while in the neonatal intensive care unit ("NICU") at Ochsner Medical Center-Kenner. *Id.* Upon discharge, the NICU referred Noah to a local pediatric treatment office for

follow-up care, including but not limited to treatment related to his consumption of infant formula. *Id.*

Starting around October 2, 2023, Noah visited the pediatric office and was prescribed an infant formula because the doctors were concerned about his weight. *Id.* Over the following few weeks, his treating physicians recommended and/or prescribed him several infant formulas, some of which his stomach could not tolerate. *Id.* at 10–11. On or about October 23, 2023, a doctor changed the formula for a fourth time to Nutramigen with Probiotic LGG Hypoallergenic Infant Formula Powder with Iron (the "Subject Formula"), as well as diagnosed Noah with thrush and prescribed him thrush medication. *Id.* at 11. The thrush medication allegedly burned his tongue, so Plaintiff stopped administering Noah the medication but continued to bottle-feed him with breast milk fortified by the Subject Formula. *Id.* Three days later, Noah began vomiting, was taken by ambulance to the emergency room, and eventually put on a ventilator. *Id.* at 11–12. Plaintiff decided to cease care, and Noah died on October 26, 2023. *Id.* at 12. Plaintiff asserts that Noah's death is the direct result of his consumption of the Subject Formula. *Id.*

Plaintiff then brought this suit against Defendants in their capacity as the alleged manufacturers of the Subject Formula. *See generally id.* In the amended complaint, Plaintiff brings four claims against Defendants, pursuing each of the four liability theories provided for in the Louisiana Products Liability Act ("LPLA"): design defect, inadequate warning, breach of express warranty, and construction defect. *Id.* at 12–23. She prays for all general and compensatory damages, special damages, wrongful death damages, and for costs. *Id.* at 23–24.

## II.    PRESENT MOTION

Defendants ask the Court to dismiss each of Plaintiff's four LPLA claims. R. Doc. 29. Overall, they argue that Plaintiff primarily asserts legal conclusions instead of pleading facts, and

the facts that are pleaded do not meet the standards set forth in Rule 8(a)(2) of the Federal Rules of Civil Procedure and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008). *See id.*

As to the individual theories, first, Defendants argue that Plaintiff has not pleaded the existence of an express warranty beyond the warranty that the Subject Formula was safe. *Id.* at 4–6. This is notable, they argue, because representations that a product is safe for its intended use is not enough to establish the existence of an express warranty under present case law. *Id.* at 4–6. Defendants also take the position that the amended complaint establishes that Plaintiff relied on her physician's representations of the Subject Formula, not the Subject Formula's express warranties herself. *Id.* at 6. As to Plaintiff's claim of a design defect, Defendants press that Plaintiff did not allege specific facts as to the defective aspects of the formula that allegedly caused her son's fatal illness. *Id.* at 6–8. And even if Plaintiff did, her design defect claim cannot survive because she did not put forth any facts to support that an alternative design exists, nor address the burden-outweighing-the-harm analysis. *Id.* at 8–10.

The third theory of failure to warn, say Defendants, is also inadequately pleaded. They take the position that Plaintiff needed to plead details as to what the warning should have been, as well as plead that the warning could have prevented her son's injuries, in order to state a claim. *Id.* at 10–11. Finally, Defendants contend that Plaintiff's amended complaint does not contain enough factual support for a construction defect claim because Plaintiff asserts no allegations as to how the Subject Formula deviated from the manufacturer's standards. *Id.* at 11–14. Instead, Defendants claim, the amended complaint overall takes the position that the Subject Formula *cannot be manufactured safely* because it is cow-milk based, so Plaintiff "cannot demonstrate that Defendants ha[ve] a safe product when constructed according to its specifications." *Id.* at 15.

Plaintiff opposed the motion. R. Doc. 33. She generally submits that the amended complaint contains well-pleaded allegations to support each element of the four LPLA liability theories. *Id.* Plaintiff consistently stressed that her pleading passes the *plausibility* threshold to allow all four of her claims to survive. *Id.* Defendants replied, largely reiterating the points raised in their motion. R. Doc. 34.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 556. A claim is plausible on its face when the plaintiff has pled facts that allow the court to "draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 570. A court must liberally construe the complaint in light most favorable to the plaintiff, accept the plaintiff's allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). However, courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Arias-Benn v. State Farm Fire & Cas. Co.*, 495 F.3d 228, 230 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)).

Because the Court is sitting in diversity, it is bound by the substantive law of Louisiana, the forum state. *Learmonth v. Sears, Roebuck & Co.*, 710 F.3d 249, 258 (5th Cir. 2013). The Louisiana Products Liability Act provides the "exclusive theories of liability for manufacturers for damage caused by their products." La. R.S. § 9:2800.52. Manufacturers are liable for "damage proximately caused by

4

a characteristic of a product that renders it unreasonably dangerous when such damage arose from a reasonably anticipated use of the product." *Id.* at § 9:2800.54A. A product "is unreasonably dangerous" under the LPLA "if and only if" it is unreasonably dangerous in any of the following four ways: (1) "in construction or composition," (2) "in design," (3) because "an adequate warning . . . has not been provided," and (4) because the product "does not conform to [a manufacturer's] express warranty." *Id.* at 9:2800.54B. An unreasonably dangerous condition cannot be presumed just because an injury occurred, and the plaintiff bears the burden of proving each element of the four LPLA theories. *Baudin v. AstraZeneca Pharm. LP*, 413 F. Supp. 3d 498, 503 (M.D. La. 2019).

## IV. ANALYSIS

Plaintiff asserts that the Subject Formula was unreasonably dangerous under all four of the LPLA's theories of liability. R. Doc. 25. Defendants move to dismiss all four claims, pressing that Plaintiff failed to state claims for construction defect, design defect, failure to warn, and breach of express warranty. R. Doc. 33. The Court finds that Plaintiff's claims can survive as to design defect, failure to warn, and breach of express warranty.

### A. Construction/Manufacturing Defect

To establish a manufacturing defect claim under the LPLA, plaintiffs must show that "at the time the product left [the] manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La. R.S. § 9:2800.55. Thus, to establish this claim, Plaintiff must plausibly plead that (1) the defendant is the manufacturer of the product, (2) the product proximately caused plaintiff's damages, (3) the damaging characteristic rendered the product unreasonably dangerous in its construction or composition, and (4) the damages arose from a reasonably anticipated use of the product. *Lewis v. Baxter Int'l, Inc.*, No.

16-16391, 2017 WL 661324, at *3 (E.D. La. Feb. 17, 2017). "This is a narrow and demanding test" because the plaintiff must show "that the *particular* product used by the [relevant individual] deviated from its intended design." *Guidry v. Janssen Pharms.*, 206 F. Supp. 3d 1187, 1197–98 (E.D. La. 2016).

Plaintiff stated that Defendants are the manufacturers of the Subject Formula and that the Subject Formula caused her son's death. R. Doc. 25 at 12. The Court finds, however, that Plaintiff has not pleaded facts to demonstrate that the Subject Formula her son consumed deviated from the manufacturer's specifications. Plaintiff's amended complaint states that "Defendants manufactured the Subject Baby Formula to help support digestive health in infants. The Subject Baby Formula deviated from that standard." R. Doc. 25 at 20. It also states that "[p]rior to Noah's birth, Defendants were aware or should have been aware that its Cow's Milk Based Products (including the Subject Infant Formula) were not safe for use, as they were used, with nutrition or nutritional support in preterm infants, yet took no steps to prevent the use of these products in such situations." *Id.* at 21. Though these allegations fall under the "construction defect" subsection of the amended complaint, these statements strike more at the heart of a design defect claim than a manufacturing defect claim. The Court's thorough search of the amended complaint holistically did not yield any factual statements rendering Plaintiff's claim of a construction defect plausible, not just possible. *See Iqbal*, 556 U.S. at 678.

Courts consistently require a plaintiff to allege, at minimum, that a breakdown of some sort occurred at a point during the manufacturing process, causing the product used by the plaintiff to be unfit for its anticipated use. For example, in *Flagg v. Stryker Corp.*, the Fifth Circuit found that a plaintiff adequately pleaded a manufacturing defect claim when the complaint explained that (1) the shape and size of plaintiff's toe implant led to complications in its removal, supporting the

idea that plaintiff's toe implant was not manufactured up to the defendant's usual standards, and (2) the composition of the metal in the toe implant negatively influenced the performance of the implant, supporting the idea that the metal used was constructed or composed in a way that deviated from the manufacturer's standards. 647 F. App'x 314, 318 (5th Cir. 2016). These allegations in *Flagg* discuss the specific *product* that the plaintiff used and how that specific toe implant could have deviated from the otherwise-safe manufacturing standards. This reinforces the idea that the *particular product* used by the plaintiff must have contained deviations from the manufacturer's usual and presumably nondefective product. *See Guidry*, 206 F. Supp. 3d at 1197–98.

Here, Plaintiff does not put forth any allegations pertaining to, for example, the specific cannisters of the Subject Formula that her son consumed, and why the contents of those specific cannisters or that specific product deviated from the manufacturer's usual standards. Instead, Plaintiff pleads that "the use of [Defendants'] Cow's Milk-Based Products with preterm infants [is] unreasonably dangerous in that its Cow's Milk-Based Products significantly increase[] the risk of [necrotizing enterocolitis] and death." R. Doc. 25 at 21. She contends that "[t]he products did not perform safely as an ordinary customer would expect when used in the intended or reasonably foreseeable manner, such that the use of Cow's Milk-Based Products as nutrition or nutritional supplements in preterm infants significantly increased the risk of [necrotizing enterocolitis] and death." *Id.* at 22.

Applying the *Twombly* standard to these statements and the amended complaint as a whole, Plaintiff's factual allegations fail to support her manufacturing defect claim because the allegations strike more at a design defect claim rather than a manufacturing or composition defect claim. Plaintiff asserts facts as to the general safety, or lack thereof, of cow's milk-based formulas—not

the safety of the *specific product* her son consumed which could otherwise be manufactured safely. Plaintiff's allegations therefore do not state a claim for relief under Rule 8(a)(2) and Rule 12(b)(6) for a manufacturing defect claim under the LPLA.

### B.  Design Defect

A design defect claim under the LPLA requires a plaintiff to sufficiently plead that "(1) [t]here existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) [t]he likelihood that the product's design would cause the claimant's damage . . . outweighed the burden on the manufacturer of adopting such an alternative design." La. R.S. § 9:2800.56. Conclusory assertions that an alternative design exists will not suffice to meet plaintiff's burden; plaintiff must identify an alternative design with *some* level of specificity, though courts are mindful that the plaintiff does not have the benefit of discovery at this stage. *Baudin*, 413 F. Supp. 3d at 507 (discussing cases wherein courts have found that "a complaint sufficiently pleads a design defect claim by alleging an alternative design in general terms, including the general characteristics of the alternative design").

Defendants press that Plaintiff failed to "allege with enough specificity that an alternative design existed, [so] it is [also] impossible for Plaintiff to plead that the gravity of the damage of the Formula as currently designed and the burden and effects of adopting an alternative design." R. Doc. 29-1 at 9. The Court disagrees. Plaintiff's allegations as to design defect meet the *Twombly* plausibility standard, a "standard [that] 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements.'" *Flagg*, 647 F. App'x at 316 (quoting *In re S. Scrap Material Co.*, 541 F.3d 584, 587 (5th Cir. 2008)). Plaintiff pleaded facts that give rise to the inference that alternative designs exist.

The amended complaint describes academic studies spanning decades which, according to Plaintiff, describe that premature infants like Noah who consume a near-exclusive human-milk based diet are significantly less likely than premature infants who consume a cow's milk-based diet to develop deadly diseases, such as necrotizing enterocolitis ("NEC"). R. Doc. 25 at 2–9. For example, some allegations contend that "advances in science have created alternative fortifiers that are derived from human milk and non-cow's milk-based products." *Id.* at 3. The studies also consistently determine, according to Plaintiff, that a higher risk of NEC is consistently connected to premature infants consuming cow's milk-based formula as opposed to premature infants consuming human milk-based products and/or breastfeeding. *E.g.*, *id.* at 3–6. The foregoing allegations, taken together with other facts in the amended complaint, demonstrate a plausible claim that an alternative design of the Subject Formula existed, and if this alternative design was, for example, human-milk based, it could have prevented Noah's death.

But to successfully plead a design defect claim, Plaintiff must also submit enough facts to allow this Court to draw a reasonable inference that the burden on Defendants to adopt the alternative design is plausibly lower than the burden of producing a product that studies have shown increases the risk of causing NEC in premature infants. The Court finds that there are sufficient facts to raise Plaintiff's right to relief above a speculative relief on the burden-balancing prong of her design defect claim.

In the amended complaint, Plaintiff describes a scientific study which "noted that cow's milk-based preterm formulas provided consistent calories and were less expensive than human milk-based products, the cow's milk-based products significantly increase the risk of NEC and death." R. Doc. 25 at 6–7. The study then described the health care costs associated with NEC, and a 2017 study described that as of 2011-2012, the cost of treating NEC could be close to $200,000,

and goes up to over $300,000 if the infant needs surgical intervention. *Id.* at 7. These facts may not strike at the heart of the cost-balancing analysis of actually *manufacturing* the drug, but it does demonstrate that Plaintiff is engaging in the cost-benefit analysis at the pleading stage. So, while Plaintiff omits specific reference to the danger of the damage outweighing the burden of adopting the alternative design, "such an omission is not so fatal as to give rise to dismissal under 12(b)(6) at this stage of the litigation." *Donald v. AstraZeneca Pharms., LP*, No. 15-4591, 2017 WL 1079186, at *3 (E.D. La. Mar. 22, 2017). Plaintiff is entitled to proceed to discovery on her design defect claim.

### C.  Failure to Warn

Plaintiff claims that Defendants failed "to properly warn and provide adequate warnings or instructions about the dangers and risks associated with the use of Cow's Milk-Based Products with preterm infants, specifically including but not limited to the risk of NEC and death." R. Doc. 25 at 15. "To maintain a failure-to-warn claim, a plaintiff must demonstrate that 'the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.'" *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 261 (5th Cir. 2002) (quoting La. R.S. § 9:2800.57).  An "adequate warning" is "a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the danger for which the claim is made." La. R.S. § 9:2800.53(9).

Notably, a manufacturer is liable for inadequate warnings "only if the defect proximately caused the plaintiff's injury." *Baudin*, 413 F. Supp. 3d at 507. Plaintiffs bear the burden of proving that but-for the inadequate warning, the underlying injury would not have occurred. *Id.* But this

failure-to-warn "does not extend to dangers that are or should be obvious or common knowledge to the ordinary user or handler of the product." *Colbert v. Sonic Rests., Inc.*, 741 F. Supp. 2d 764, 770 (W.D. La. 2010) (citing La. R.S. § 9:2800.57B).

Defendants contend that Plaintiff only recites conclusory statements alleging the presence of an inadequate warning, but without any factual support beyond the presence of "hidden dangers and risks" in the Subject Formula. R. Doc. 29-1 at 10–11. The Court finds that Plaintiff pleaded enough to sustain a failure-to-warn claim under the LPLA. Specifically, the amended complaint includes medical research showing an alleged correlation between cow's milk-based products and an increased risk of NEC and death in premature infants. R. Doc. 25 at 2–9. This supplies sufficient facts to plausibly show a correlation between the Subject Formula and aforementioned risks, satisfying the damage-causing characteristic element, at least at the motion to dismiss stage.

Plaintiff also pleaded enough to make a plausible claim that Defendants failed to use reasonable care to provide an adequate warning of the risk of NEC and death in premature infants who consume cow's milk-based products. *Stahl*, 283 F.3d at 261. The amended complaint states that "[d]espite the knowledge of significant health risks posed to preterm infants ingesting the Cow's Milk-Based Products, including the significant risk of NEC and death, Defendants did not warn parents or medical providers of [these risks] . . . nor . . . provide[] any instruction on how to properly use its Cow's Milk-Based Products so as to lower the risk [of] or avoid NEC or death." R. Doc. 25 at 9. It further specifies that Defendants "did not provide any warning in their labeling, websites, or marketing that warns that their Cow's Milk-Based Products exponentially increase the risk of NEC and death in preterm infants" and "that human breast milk, donor milk, and human breast milk-based formulas and fortifiers are much safer for preterm babies than their Cow's Milk-Based Products." *Id.* At the motion to dismiss stage, the foregoing states a plausible claim for

relief. *Cf. Bjorklund v. Novo Nordisk A/S*, 705 F. Supp. 3d 636, 641 (W.D. La. 2023) (quoting *Baudin*, 413 F. Supp. 3d at 510) ("At the pleading stage, a plaintiff is not required 'to detail what an adequate warning would be and how an adequate warning would have caused [his] treating physician to act differently.'").

### D.  Breach of Express Warranty

Defendants take the position that the amended complaint only contains allegations that Defendants held the Subject Formula out as safe or effective, and that under Louisiana law, merely stating that a product is safe or effective does not amount to an express warranty. R. Doc. 29-1 at 4. An express warranty is defined under Louisiana law as "a representation, statement of alleged fact or promise about a product or its nature, material or workmanship that represents, affirms or promises that the product or its nature, material or workmanship possesses specified characteristics or qualities or will meet a specified level of performance." La. R.S. § 9:2800.53(6). Notably, "'Express Warranty' does not mean a general opinion about or general praise of a product." *Id.*

The LPLA provides that "[a] product is unreasonably dangerous when it does not conform to an express warranty made at any time by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was not true." La. R.S. § 9:2800.58. Therefore, to state a claim for breach of express warranty, a plaintiff must plead that "(1) the manufacturer made an express warranty regarding the product, (2) the plaintiff was induced to use the product because of that warranty, (3) the product failed to conform to that express warranty, and (4) the plaintiff's damage was proximately caused because the express warranty was untrue." *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 452 (5th Cir. 2002). A plaintiff is not required to "point to specific language offered by a manufacturer," but must still "specify the warranty in question"

to state a claim for relief. *Fuller v. Eisai Inc.*, 513 F. Supp. 3d 710, 722 (E.D. La. 2021) (internal quotations omitted).

Defendants construe the amended complaint to only contain allegations that they marketed the Subject Formula as safe for consumption, and this kind of marketing does not rise to the level of an express warranty. R. Doc. 29-1 at 4–5. They also contend that the amended complaint contains no explanation as to how the Plaintiff *herself* was induced by the express warranty to purchase the Subject Formula because the amended complaint states that Plaintiff relied on her son's physicians when purchasing the Subject Formula. *Id.* at 5. The Court finds that Plaintiff's breach of express warranty claim survives the motion to dismiss stage.

As to the express warranty itself, the amended complaint states that "the Defendants began heavily promoting 'human milk fortifiers,' a name which misleadingly suggests that the product is derived from human milk, instead of being derived from Cow's Milk." R. Doc. 25 at 8. This is significant, claims Plaintiff, because this new marketing tactic occurred after "a shift in the medical community towards an exclusive human-based diet for preterm infants." *Id.* Plaintiff contends that this marketing, as well as similar "competing, systematic, powerful, and misleading marketing campaigns" were pursued by Defendants despite them "knowing the significant health risk[s] posed by ingesting [cow's milk-based] products, especially to preterm, low-weight infants like Noah." *Id.* at 8–9. Plaintiff thus submits that Defendants created an express warranty by holding cow's milk-based products out as safe and "equal, or even superior, substitutes to breastmilk" to persuade parents and physicians to purchase the Subject Formula. *Id.* at 8. Altogether, and construing the allegations in a light most favorable to Plaintiff, the Court finds that she has pleaded enough facts to allow the Court to infer that Defendants engaged in an elaborate marketing scheme

that the Subject Formula is safe for premature infants despite Defendants' alleged knowledge that cow's milk-based products are not safe for premature infants. *Id.* at 8–9.

As to Plaintiff's inducement to use the product because of the aforementioned express warranty, Plaintiff herself does not necessarily need to be the specific party induced. The LPLA provides that the express warranty can induce "the claimant *or another person or entity* to use the product." La. R.S. § 9:2800.58. At least one court in this circuit has found a viable breach of express warranty claim when the plaintiff alleged that the manufacturer engaged in an aggressive and misleading marketing campaign to induce doctors to use the product and the plaintiff's surgeon used the product in the plaintiff's surgery. *Boutte v. Stryker Biotech, LLC*, 67 F. Supp. 3d 732, 738–39 (5th Cir. 2014).

Here, Defendants are correct that Plaintiff pleaded that she used the Subject Formula because it "was given to her" by a treating physician. R. Doc. 25 at 11. However, she also submits that "Defendants developed relationships, which included incentives and financial gain to healthcare providers and facilities for using their Cow's Milk-Based Products" and that "if healthcare providers and health care staff had been properly instructed and warned of the risks associated with the use of Cow's Milk-Based Products with preterm infants, they would not have used such a dangerous product." *Id.* at 16. Construing these allegations in a light most favorable to Plaintiff, she has pleaded enough to allow this Court to infer that her physician may not have recommended that Plaintiff feed her premature infant son the Subject Formula without the Defendants' representations in their marketing campaigns that cow's milk-based products are safe for premature infants like Noah. Plaintiff has stated a plausible breach of express warranty claim pursuant to Rule 8(a)(2) and *Twombly*.

## V.     CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the motion to dismiss the amended complaint for failure to state a claim filed by Defendants is **DENIED**.

New Orleans, Louisiana, this 23rd day of December, 2025.

_____
THE HONORABLE ELDON E. FALLON